## No. 16,044.

### People ex rel. Attorney General *v.* Berenbeim.

(212 P. [2d] 856)

Decided November 28, 1949.

Mr. H. Lawrence Hinkley, Attorney General, Mr. James D. Geissinger, Assistant, for complainant.

Mr. Philip Hornbein, Mr. Philip Hornbein, Jr., for respondent.

*En Banc.*

Mr. Justice Hays delivered the opinion of the court.

This is an original proceeding in disbarment brought by the attorney general on behalf of the people against Samuel Leonard Berenbeim, respondent, upon the ground that said respondent had been convicted in the United States District Court for the District of Colorado, of conspiracy to defraud the United States of America and to commit offenses against the United States of America, to wit: To violate the provisions of Title 18, sections 80 and 88, U. S. Code Annotated. The judgment

of the District Court of the United States was affirmed by the circuit court of appeals, *Berenbeim v. United States,* 164 F. (2d) 679, and certiorari denied by the Supreme Court of the United States, *Berenbeim v. United States,* 333 U. S. 827.

Respondent having answered the complaint, the matter was referred to the Honorable Robert W. Steele, one of the judges of the district court of the City and County of Denver, as referee, and after extended hearings including the taking of much testimony and a careful examination of the proceedings in the Federal courts, the referee made his findings and report, the pertinent parts thereof being as follows:

"The complaint alleges as a ground for disbarment that respondent was convicted of a conspiracy to defraud the United States and to violate certain sections of the Criminal Code of the United States, said conviction having taken place in the District Court of the United States for the District of Colorado at a trial to a jury upon an indictment returned by a grand jury; that respondent was sentenced to imprisonment for a period of two years and ordered to pay a fine of $2500.00; that the conviction and sentence were affirmed by the United States Circuit Court of Appeals and petition for writ of certiorari denied by the Supreme Court of the United States.

"All of these allegations of the complaint are admitted by the respondent. He was confined in the Federal Prison Camp, supra, from February 25, 1948, to November 25, 1948. The fine imposed upon him was paid and he has been at liberty on parole since November 25, 1948. The parole will terminate on February 22, 1950, if the terms and conditions thereof are complied with by the respondent.

"Respondent's defense to the complaint seeking his disbarment are, that the offense of which he was convicted does not involve moral turpitude; that he acted in good faith at all times in connection with the trans-

actions which brought about the indictment and his conviction; that he believed he had a right to do what he did; that he had no intention of defrauding the Government of the United States or of making false or fraudulent statements on representations to the Government or its agencies; that he has always enjoyed a good reputation and has never before been accused or convicted of wrongdoing; that he was in truth not guilty of the charges made against him and should have been acquitted.

"Respondent Berenbeim was State agent in Colorado for Ancient Order of United Workmen, a fraternal benefit society organized under the laws of Kansas, engaged in writing life insurance upon the lives of its members, and as such representative he employed agents to solicit policies of life insurance in said society. Among the agents so employed were Ben Schechter, Harold Mankoff and Marie Stoeffler. These three persons were named as defendants together with respondent in the indictment, supra, and all were tried together and all found guilty.

"Article IV of the Soldiers' and Sailors' Relief Act, as amended, provided in substance that the United States would keep in force, by the payment of premiums due, life insurance policies on the lives of persons in the military service of the United States, provided the policies did not contain a war exclusion clause, and provided that the policy was in force and a premium had been paid thereon not less than thirty days before the date on which the insured entered the military service. Application for the benefits of the Act was required to be made to the Veterans Administration by the insured, showing that the insured was actually in the service; the due date of last premium paid on the policy; and requesting the benefits allowed.

"Before the application could be approved by the Veterans Administration, a report from the insurer was necessary, and this report was required to disclose the

effective date of the insurance policy and the due date of the last premium paid on the policy.

"It had been a custom and practice of long standing for the Ancient Order of United Workmen to date all policies issued by it (unless otherwise requested) the first day of the month during which the application for insurance was received, regardless of the actual date of the issuance of the policy. The A.O.U.W. issued its policies without the war exclusion clause, thus agreeing with its policy-holders to pay the benefits under the policies to the beneficiaries even though the insured was a casualty of war. The evidence revealed that the A.O.U.W. was one of very few insurance companies issuing policies without the exclusion clause, and as only policies without the clause could qualify for benefits under the Act of Congress, its contracts of insurance were readily sold to those about to be inducted into military service.

"Respondent corresponded with the main office of the society regarding the dating back to the first of the month of policies actually issued at a later date, and was informed that such practice was permissible and not wrongful or fraudulent or a violation of law or regulations of the Veterans Administration.

"Respondent wrote to the Veterans Administration concerning the custom of dating policies and received no reply. In many instances policies were approved by the Veterans Administration for benefits under the Act which, in truth, had not been in force for thirty days preceding the insured's entry into service and on which no premium had been paid at least thirty days before induction. These policies were approved for benefits because of the statement from the society to the Veterans Administration showing the policy to have been in effect and a premium paid thereon more than thirty days prior to the date of induction; whereas in truth, the policy had not been in effect for that period but had been dated back to the first of the month, following the custom of the society. Respondent admits that he knew

of this practice on the part of the officers of the society, but asserts that he believed it justified and in no sense wrongful.

"The indictment contains many charges of fraud in addition to that of giving policies a fictitious date. As to these charges, respondent maintains his innocence of any active, personal participation.

"Concerning the charges generally as to all defendants, the Circuit Court of Appeals had this to say:

" 'The conspiracy laid in the indictment in this case and established to the satisfaction of the jury consisted of related steps in an integrated operation. They were making false representations to induce men either in the military service or about to enter it to make applications for policies; sending or causing to be sent to the company applications obtained in that manner, accompanied by faked or fictitious reports of medical examination; sending or causing to be sent applications in duplicate for benefits under the Act, one copy to the company and one to the Veterans Administration; and causing the company to send reports to the Veterans Administration, all for the purpose of bringing about the guarantee of the premiums on the policies, the Veterans Administration basing its guarantee on the information contained in the applications and in the reports of the company. While the applications for policies and the reports of medical examination were sent to the company, not the Veterans Administration, every step in the pattern uniformly followed by the defendants were intended and designed to lay the foundation for the guarantee of the premiums on the policies. Merely bringing about the issuance and delivery of the policies was not the ultimate objective. The insured would not have the funds with which to pay the premiums while in military service. The guarantee of the Veterans Administration was essential to the defendants collecting their respective percentages of the premiums. All of the steps short of that were without any financial re-

ward. The scheme apparently designed, patterned, and carried out with deliberate care involved from the very outset much more than merely dating policies back to the first day of the current month in which the applications were submitted and the paying of the first premium on them. It was saturated with falsity and concealment. The prospects were told in substance that they could obtain the insurance coverage without cost or liability. The obligation to reimburse the government for premiums paid was carefully concealed. The applications for insurance were held until the strategic time arrived and were then filled out. The reports of medical examination were faked. Certain material information given in the applications for benefits under the Act was misleading and deceptive. And as contemplated by the defendants, the reports of the insurance company contained statements or representations similar to the misleading and deceptive representations contained in the applications for benefits under the Act in respect of the time the insurance had been in effect and a premium paid thereon. All of that was done for the purpose of bringing about the guarantee of the premiums, after which the defendants would reap their financial reward. An agreement to enter into such a concert of action for that ultimate end attended by one or more overt acts by one or more of the parties constitutes a conspiracy to defraud the United States, in violation of section 37, supra.'

"Respondent's chief claim for immunity from discipline in this proceeding relates to the dating of the policies on the first of the month in accordance with the custom of the society in effect over fifty years, and his insistence that in his acquiescence in such practice he is guilty of no conduct involving *gross* moral turpitude.

"In the opinion of the referee, respondent's contentions are without merit. The custom of the company need not have been disturbed so far as its relations with

the policy-holders were concerned. It was not the mere fact of giving the policies a date prior to their actual issuance that brought about respondent's conviction. It was rather the false information given to the Government that the policies had been in force and that ·a premium had been paid on them, for a sufficient length. of time to make them eligible for benefits, that constitutes the crime, and respondent admits that he knew this was being done. There is nothing ambiguous in the Act of Congress concerning the type of policy entitled to the protection of the Government. In the main there were three essential conditions which had to be met in order to qualify for benefits.

"*First*, the policy must have been free of the war exclusion clause.

"*Second*, the insured must have entered the military service of the United States and must have applied for the benefits of the Act after entering the service.

"*Third*, the policy must have been in effect and a premium paid on it at least thirty days before the insured entered the service.

"The respondent, and the other defendants as well, profited considerably as a result of the conduct indulged in. By the expedient used in dating policies back, they greatly augmented the class of policy holders eligible for government favor, and brought into that class a large number of persons who obviously were not intended by the Congress to be the recipients of benefits. In the solicitation of business the society had a virtual monopoly under the circumstances disclosed. Few, if any, other large insurance companies issued policies without the exclusion clause, and none other, so far as shown by the record, employed the methods here revealed to enlarge the groups who could qualify under the Act. The custom of the society in dating policies back to the first of the month is no justification for informing the Government that the policies were in fact in force on that date.

"Respondent complains that the trial court committed error in instructing the jury relative to the good faith of the defendants, and alleges that the point was not considered on appeal because no exception was taken to the erroneous instruction. The Circuit Court of Appeals did say that the question was not open to review because no exception was taken, and it is probably true that the instruction shifted the burden to the defendants to establish good faith affirmatively. But Judge Bratton, in the Circuit Court opinion, referred to the fact that in other instructions, at least three times the court specifically told the jury that intent to defraud was an essential element of the offense charged, and that before there could be a conviction the jury must find from the evidence beyond a reasonable doubt that the defendants had a corrupt intent. In this connection Judge Bratton said:

" 'It is inconceivable that the jury could have failed to understand that if the defendants acted in good faith they should go free.'

"The referee finds: That the offense with which the respondent was charged involves gross moral turpitude. That the respondent Berenbeim was guilty as charged. That the respondent was represented at the trial and on appeal by able counsel. That the respondent had a fair trial. Respondent is thirty years' old, married and the father of two young children. He has lived in Denver all his life. He was admitted to the Bar of Colorado in 1941 and has always enjoyed a good reputation. It is highly improbable that he will ever again depart from the course of conduct prescribed for members of the legal profession."

The referee recommended that the license of respondent to practice law in Colorado be suspended.

After full consideration of the proceedings before the referee and the transcript of the proceedings in the district court of the United States for the District of

Colorado, we are of the opinion that there is no legitimate reason for disturbing the findings and report of the referee and the same are hereby approved and adopted.

The judgment of the court therefore is that respondent be suspended from the practice of law in Colorado for a period of one year from the date of the announcement hereof.